753 F.2d 1528
 53 USLW 2450, 22 Ed. Law Rep. 1141
 Carolyn GROVE, Warren Riddle, and Sylvia Riddle, Plaintiffs-Appellants,
v.
MEAD SCHOOL DISTRICT NO. 354, et al., Defendants-Appellees.
Carolyn GROVE, Warren Riddle, and Sylvia Riddle, Plaintiffs-Appellees,
v.
MEAD SCHOOL DISTRICT NO. 354, et al., Defendants,
and
Mead Education Association, Defendant-Intervenor-Appellant.
 Nos. 83-3690, 83-3784.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 4, 1984.
Decided Feb. 22, 1985.
As Amended April 15, 1985.
 
 Michael P. Farris, Washington, D.C., for plaintiffs.
 Garald A. Gesinger, Deputy Pros. Atty., Spokane, Wash., Judith Lonnquist, Durning, Webster & Lonnquist, Seattle, Wash., for defendants.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before WRIGHT, PREGERSON, and CANBY, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 At issue here is a school board's refusal to remove a book from a sophomore English literature curriculum based on plaintiffs' religious objections to the book. Plaintiffs brought this civil rights suit arguing that use of the book violates the religion clauses of the First Amendment.
 
 
 2
 The district court granted summary judgment to defendants, finding no violation of the Constitution. We also must decide whether plaintiffs have standing to bring this suit, whether they were given adequate notice that the district court was considering a grant of summary judgment, and whether attorneys' fees should have been awarded to the defendant intervenor.
 
 FACTS
 
 3
 Cassie Grove was assigned The Learning Tree, by Gordon Parks, in her public school sophomore English literature class. She read part of it, found it offensive to her religious beliefs, and showed it to her mother. Her mother read the entire book and agreed.
 
 
 4
 The Groves informed the teacher of their objections and Cassie was assigned another book. She was given permission to leave during classroom discussion of The Learning Tree, but chose to remain.
 
 
 5
 Mrs. Grove (hereinafter Grove) filed a formal complaint concerning the book with the school district. An evaluation committee concluded that The Learning Tree "is an appropriate element of the sophomore English curriculum." Grove and the Riddles, taxpayers, appealed to the Board of Directors of the school district. After a hearing, the Board denied the request to remove the book from the curriculum.
 
 
 6
 Plaintiffs then brought this civil rights suit under 42 U.S.C. Sec. 1983 against the school district. They contend that use of The Learning Tree violated the religion clauses of the First Amendment. They seek damages and injunctive relief. The Mead Education Association, bargaining representative for the district teachers, was allowed to intervene as a defendant.
 
 
 7
 The defendants filed motions to dismiss in district court. After reading plaintiffs' affidavits and the book and conducting a hearing, the judge granted summary judgment for the defendants and denied their requests for attorneys' fees.
 
 ANALYSIS
 I. STANDING
 
 8
 If the plaintiffs lack standing to bring this suit, the courts lack jurisdiction to consider it. Allen v. Wright, --- U.S. ----, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984). To satisfy constitutional standing requirements, a plaintiff must allege distinct personal injury that is fairly traceable to the challenged conduct and likely to be redressed by the requested relief. Id. 104 S.Ct. at 3325. Prudential limitations on the exercise of jurisdiction include a general prohibition on a litigant's raising another's rights. Id. at 3324-25.
 
 A. Free Exercise Claims
 
 9
 Appellants have standing to challenge alleged violations of the free exercise clause of the First Amendment only if they claim infringement of their personal religious freedom. McGowan v. Maryland, 366 U.S. 420, 429, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393 (1961).
 
 
 10
 One aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). As a parent, Grove has a direct, personal right to direct Cassie's religious training. Collins v. Chandler Unified School District, 644 F.2d 759, 764 n. 1 (9th Cir.), cert. denied, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981).
 
 
 11
 The Riddles present no claim of violation of a personal right of religious freedom. In the complaint, their only interest is identified as their taxpayer status. Appellants assert that the Riddles are the parents of school-age children in the district, but not that the children have attended public school there. The Riddles do not have standing to pursue their free exercise claims.
 
 B. Establishment Claims
 
 12
 Appellants have standing to challenge alleged violations of the establishment clause of the First Amendment if they are directly affected by use of The Learning Tree in the English curriculum. Abington School District v. Schempp, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963). Grove has standing as a parent whose right to direct the religious training of her child is allegedly affected. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15; Abington School District, 374 U.S. at 224 n. 9, 83 S.Ct. at 1572 n. 9.
 
 
 13
 Whether the Riddles as taxpayers may bring an establishment clause challenge is not simply answered. The Supreme Court has made it clear that a federal taxpayer has no standing to maintain a purely religious objection to federal expenditures. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 478, 102 S.Ct. 752, 762, 70 L.Ed.2d 700 (1982). But cf. K. Davis, 4 Administrative Law Treaties Sec. 24:25 (2d ed. 1983). Similarly, a state taxpayer has been held not to have standing to assert a purely religious objection to Bible reading. Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).
 
 
 14
 On the other hand, municipal taxpayers have traditionally been held to have standing to assert objections to municipal expenditures. See Massachusetts v. Mellon, 262 U.S. 447, 486, 43 S.Ct. 597, 600, 67 L.Ed. 1078 (1923). The First Circuit concluded, in a case subsequently reviewed on the merits by the Supreme Court, that Valley Forge did not change the rule that a municipal taxpayer could assert a religious objection to a city's use of public resources, there the maintenance of a creche on city property. Donnelly v. Lynch, 691 F.2d 1029, 1031 (1st Cir.1982), rev'd, --- U.S. ----, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). See also Conrad v. City and County of Denver, 656 P.2d 662, 669 (Colo.1982); Fausto v. Diamond, 589 F.Supp. 451, 460 n.5 (D.R.I.1984).
 
 
 15
 We need not resolve the question of the Riddles' taxpayer standing here, however, because Grove has standing to pursue the establishment clause claims. We therefore may proceed to the merits. See, e.g., Watt v. Energy Action Educational Foundation, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).
 
 
 16
 II. NOTICE OF CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT
 
 
 17
 Grove contends that the district judge provided insufficient notice of his intent to treat defendants' pretrial motions as motions for summary judgment. She argues that she was denied an adequate opportunity to conduct discovery that would support her claims, in violation of due process.
 
 
 18
 Whenever a district court looks beyond the pleadings in evaluating a Rule 12(b)(6) motion to dismiss, the motion must be treated as one for summary judgment under Rule 56. Fed.R.Civ.P. 12(b)(6); Portland Retail Druggists Association v. Kaiser Foundation Health Plan, 662 F.2d 641, 645 (9th Cir.1981). Before summary judgment may be entered, all parties must be given notice of the motion and an opportunity to respond. Portland Retail Druggists, 662 F.2d at 645. The opportunity to respond must include time for discovery necessary to develop facts justifying opposition to the motion. Id.; Fed.R.Civ.P. 56.
 
 
 19
 In this circuit, notice is adequate if the party against whom judgment is entered is "fairly apprised" that the court will look beyond the pleadings, thereby transforming the motion to dismiss into a motion for summary judgment. Mayer v. Wedgewood Neighborhood Coalition, 707 F.2d 1020, 1021 (9th Cir.1983) (per curiam) (citing Portland Retail Druggists, 662 F.2d at 645). When a party is represented by counsel, formal notice may be unnecessary. See Garaux v. Pulley, 739 F.2d 437, 439-40 (9th Cir.1984). Notice occurs when a party has reason to know that the court will consider matters outside the pleadings. See Townsend v. Columbia Operations, 667 F.2d 844, 849 (9th Cir.1982).
 
 
 20
 A represented party who submits matters outside the pleadings to the judge and invites consideration of them has notice that the judge may use them to decide a motion originally noted as a motion to dismiss, requiring its transformation to a motion for summary judgment. Id.; see Garaux, 739 F.2d at 439.
 
 
 21
 Grove submitted matters outside the pleadings. On August 18 the parties agreed that the judge should then read The Learning Tree. On August 30 Grove submitted copies of affidavits of her witnesses. At the September 13 hearing the judge relied on the book and Grove's affidavits in deciding the motion. Grove had adequate notice that he would do so.
 
 III. FIRST AMENDMENT
 
 22
 The grant of summary judgment is reviewable de novo. National Union Fire Insurance Co. v. Argonaut Insurance Co., 701 F.2d 95, 96 (9th Cir.1983). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).
 
 
 23
 Local school boards have broad discretion in the management of schools. Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Judicial supervision of public education is limited to the resolution of conflicts that clearly involve constitutional values. Id.; Nicholson v. Board of Education, 682 F.2d 858, 863 (9th Cir.1982).
 
 
 24
 Grove contends that the Board's refusal to prohibit use of The Learning Tree in high school English courses violated the First Amendment religion clauses. Those clauses provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.
 
 A. Free Exercise of Religion
 
 25
 The free exercise clause recognizes the right of every person to choose among types of religious training and observance, free of state compulsion. Abington School District, 374 U.S. at 222, 83 S.Ct. at 1571. To establish a violation of that clause, a litigant must show that challenged state action has a coercive effect that operates against the litigant's practice of his or her religion. Id. at 223, 83 S.Ct. at 1572.
 
 
 26
 The state action at issue here is a school board policy of academic freedom and refusal to remove from the curriculum a book that offends Grove's religious sensibilities. Three factors are relevant in our analysis: (1) the extent of the burden upon the exercise of religion, (2) the existence of a compelling state interest justifying that burden, and (3) the extent to which accommodation of the complainant would impede the state's objectives. Callahan v. Woods, 736 F.2d 1269, 1273 (9th Cir.1984).
 
 
 27
 The burden on Grove's free exercise of religion was minimal. Cassie was assigned an alternate book as soon as she and Grove objected to The Learning Tree. Cassie was given permission to avoid classroom discussions of The Learning Tree. We agree with the district court's finding that no coercion existed.
 
 
 28
 The state interest in providing well-rounded public education would be critically impeded by accommodation of Grove's wishes.
 
 
 29
 If we are to eliminate everything that is objectionable to any of [the religious bodies existing in the United States] or inconsistent with any of their doctrines, we will leave public education in shreds.
 
 
 30
 Florey v. Sioux Falls School District 49-5, 619 F.2d 1311, 1318 (8th Cir.), cert. denied, 449 U.S. 987, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980) (quoting McCollum v. Board of Education, 333 U.S. 203, 235, 68 S.Ct. 461, 477, 92 L.Ed. 649 (1948) (Jackson, J., concurring)).
 
 
 31
 In light of the absence of coercion and the critical threat to public education, we conclude that the school board has not violated the free exercise clause. Id. at 1318-19.
 
 B. Establishment of Religion
 
 32
 The establishment clause of the First Amendment requires government neutrality with respect to religion. Abington School District, 374 U.S. at 215, 83 S.Ct. at 1567. It was intended to protect against "sponsorship, financial support, and active involvement of the sovereign in religious activity." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (quoting Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)).
 
 
 33
 To pass constitutional muster, challenged state action (1) must have a secular purpose, (2) must have a primary effect that neither advances nor inhibits religion, and (3) must not foster excessive state entanglement with religion. Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111-12. The option of nonparticipation does not save state action from an establishment clause challenge. Engel v. Vitale, 370 U.S. 421, 430, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962).
 
 
 34
 Religious activities prohibited in public schools include daily readings from the Bible, Abington School District, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844, recitation of the Lord's Prayer, id., posting the Ten Commandments in every classroom, Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), beginning school assemblies with prayer, Collins, 644 F.2d 759, and teaching a Transcendental Meditation course that includes a ceremony involving offerings to a deity, Malnak v. Yogi, 592 F.2d 197 (3d Cir.1979). The Supreme Court has stated clearly that literary or historic study of the Bible is not a prohibited religious activity. Stone, 449 U.S. at 42, 101 S.Ct. at 194; Abington School District, 374 U.S. at 225, 83 S.Ct. at 1573. Not all mention of religion is prohibited in public schools.
 
 
 35
 Appellants contend that use of The Learning Tree in an English literature class has a primary effect of inhibiting their religion, fundamentalist Christianity, and advancing the religion of secular humanism. The district court concluded that use of the book was not a religious activity and that it served a secular educational function.
 
 
 36
 At issue here is not a ritual, but students reading
 
 
 37
 a novel with autobiographic overtones used in the English literature class ... for purposes of exposing students to expectations and orientations of Black Americans.
 
 
 38
 District Court Memorandum Decision at 4. The central theme of the novel is life, especially racism, from the perspective of a teenage boy in a working class black family. Comment on religion is a very minor portion of the book. Its primary effect is secular.
 
 
 39
 Secular humanism may be a religion. See Rhode Island Federation of Teachers v. Norberg, 630 F.2d 850, 854 (1st Cir.1980). The Learning Tree, however, was included in a group of religiously neutral books in a review of English literature, as a comment on an American subculture. Its use does not constitute establishment of religion or anti-religion.
 
 IV. ATTORNEYS' FEES
 
 40
 Defendant-intervenor Mead Education Association moved for an award of attorneys' fees below, under 42 U.S.C. Sec. 1988. Its motion was denied. It cross-appeals that denial of fees and seeks an award of fees on appeal.
 
 
 41
 A defendant who prevails in a Sec. 1983 action is awarded attorneys fees "only where the action brought is found to be unreasonable, frivolous, meritless or vexatious." Mayer v. Wedgewood Neighborhood Coalition, 707 F.2d 1020, 1021 (9th Cir.1983) (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)). Awards to intervenors should not be granted unless the intervenor plays a significant role in the litigation. See Seattle School District No. 1 v. State of Washington, 633 F.2d 1338, 1349-50 (9th Cir.1980), aff'd, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982); see also Donnell v. United States, 682 F.2d 240, 245-49 (D.C.Cir.1982), cert. denied, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983). A district court's denial of fees is reviewed for abuse of discretion. Seattle School District No. 1, 633 F.2d at 1349.
 
 
 42
 The Education Association did not play an exceptional role in this litigation. The district court's denial of attorneys' fees was not an abuse of discretion. Attorneys' fees on appeal are denied also.
 
 
 43
 AFFIRMED.
 
 CANBY, Circuit Judge (concurring):
 
 44
 I concur in Judge Wright's clear and concise opinion. Because plaintiffs pose a novel problem, however, in the delicate area of church-state relations, I write separately to amplify my views on this matter of first impression.
 
 I. Establishment Clause
 
 45
 "[O]ne of the mandates of the First Amendment is to promote a viable, pluralistic society and to keep government neutral, not only between sects, but between believers and nonbelievers." Walz v. Tax Commission, 397 U.S. 664, 716, 90 S.Ct. 1409, 1436, 25 L.Ed.2d 697 (1970) (Douglas, J., dissenting).[1] Plaintiffs do not dispute this goal. They claim, however, that The Learning Tree reflects a set of secular, if not anti-religious values--values which they denominate "secular humanism"--so that inclusion of the book in the public secondary school curriculum violates this salutary principle of neutrality.[2]
 
 
 46
 The sincerity of plaintiffs' religious objections to The Learning Tree is not disputed, nor is the fact that the book deeply offends plaintiffs. Even accepting, however, that the work is antithetical to the particular Christian beliefs espoused by plaintiffs, its inclusion in the high school curriculum does not violate the establishment clause.
 
 
 47
 The first amendment prohibits the establishment of religion but does not define religion. Plaintiffs insist that The Learning Tree embodies the philosophy of secular humanism, and that secular humanism is a religion. There are substantial analytical difficulties with this contention, and with its underlying use of the term "secular humanism."[3]
 
 A. Secularism as Religion
 
 48
 Plaintiffs frequently seem to regard "secular" and "humanist" as synonyms for "anti-religious."[4] The common meaning of those terms does not support the assumption. "Humanism,"[5] for example, is not necessarily incompatible with religion generally or with theistic commitments, including Christianity, in particular.[6] We assume, however, that the thrust of plaintiffs' attack is against nontheistic[7] humanism, which they might label "secular humanism."
 
 
 49
 The analytical difficulty with plaintiffs' approach is that it tends to divide the universe of value-laden thought into only two categories--the religious and the anti-religious. By adopting this dualistic social outlook, and by denominating the anti-religious half of their universe as "secular," plaintiffs erect an insurmountable barrier to meaningful application of the establishment clause to controversies like this one. Whether the inclusion of The Learning Tree in the curriculum violates the establishment clause depends, under Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111-12, 29 L.Ed.2d 745 (1971), upon whether that inclusion reflects a secular purpose and produces a secular effect. The difficulty is that plaintiffs might well concede that the primary purpose and effect was secular; indeed, that is precisely their point.
 
 
 50
 It is apparent that so long as plaintiffs deem that which is "secular" in orientation to be anti-religious, they are not dealing in the same linguistic currency as the Supreme Court's establishment decisions. If the establishment clause is to have any meaning, distinctions must be drawn to recognize not simply "religious" and "anti-religious," but "non-religious" governmental activity as well. In the parlance of Lemon v. Kurtzman, "secular" must mean "non-religious." Therefore, plaintiffs cannot succeed in demonstrating a violation of the establishment clause by showing that the school authorities are somehow advancing "secular" goals.
 
 
 51
 Part of plaintiffs' argument, however, is that secular humanism is itself a religion. They rely principally upon Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).[8] In Torcaso, the Supreme Court did assume without deciding that certain non-theistic beliefs, including secular humanism, were "religions" for purposes of the first amendment:
 
 
 52
 Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others (citations omitted).
 
 
 53
 Id. at 495 n. 11, 81 S.Ct. at 1684 n. 11 (dictum). The apparent breadth of the reference to "Secular Humanism," however, is entirely dependent upon viewing the term out of context. In context, it is clear that the Court meant
 
 
 54
 no more than a reference to the group seeking an exemption in Fellowship of Humanity v. County of Alameda, 153 Cal.App.2d 673 [315 P.2d 394] (1957) which, although non-Theist in belief, also met weekly on Sundays and functioned much like a church.... Thus Torcaso does not stand for the proposition that "humanism" is a religion, although an organized group of "Secular Humanists" may be.
 
 
 55
 Malnak v. Yogi, 592 F.2d 197, 206 & 212 (3d Cir.1979) (Adams, J., concurring).
 
 
 56
 Even if The Learning Tree is viewed as representative of what can fairly be characterized as "secular humanism," it remains an autobiographical novel only tangentially concerned with religion. The work "is still far removed from a comprehensive belief system laying claim to ultimate truth and supported by a formal group," id. at 212, which the Court was prepared to concede in Torcaso would constitute a religion. See also Womens Services, P.C. v. Thone, 483 F.Supp. 1022, 1034 (D.Neb.1979) aff'd, 636 F.2d 206 (8th Cir. 1980), vacated on other grounds, 452 U.S. 911 (1981) (concluding that nontheistic beliefs are "religions" in constitutional terms only if characterized by tenets and organization).
 
 
 57
 Furthermore, in suggesting that secular humanism may be a religion, neither Torcaso nor plaintiffs distinguish between "establishment" and "free exercise."[9] Torcaso is a free exercise case. While the Supreme Court has embraced a concept of religion in the free exercise context sufficiently expansive to encompass nontheistic views,[10] there is much to be said for the view that the definition of religion should vary with the clause under review.
 
 
 58
 While a generous functional (and even idiosyncratic) definition best serves free exercise values, the same expansiveness in interpreting the establishment clause is simply untenable in an age of such pervasive governmental activity:
 
 
 59
 To borrow the ultimate concern test from the free exercise context and use it with present establishment clause doctrines would be to invite attack on all programs that further the ultimate concerns of individuals or entangle the government with such concerns.
 
 
 60
 Note, "Toward a Constitutional Definition of Religion," 91 Harv.L.Rev. 1056, 1084 (1978); see Int'l Soc. for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 439-40 (2d Cir.1981) (Kaufman, J.). Thus, "a less expansive notion of religion [is] required for establishment clause purposes lest all 'humane' programs of government be deemed constitutionally suspect." L. Tribe, American Constitutional Law 827-28 (1978).[11]
 
 
 61
 In any event, it is sufficient here simply to point out that plaintiffs have not alleged facts showing anything remotely resembling an establishment of a religion of secular humanism. At issue is not the wholesale imposition of secular humanist dogma, however defined,[12] but the assignment in the secondary curriculum of a discrete work, The Learning Tree by Gordon Parks. In assessing whether inclusion of a work violates the establishment clause, conclusionary characterizations are of little aid in the inquiry. See Lynch v. Donnelly, --- U.S. ----, 104 S.Ct. 1355, 1361-62 (1984). Establishment clause analysis is necessarily fact-dependent. Id. We must apply the clause in light of the text of the book itself, and the manner of its use in the curriculum.
 
 B. Entanglement, Purpose and Effect
 
 62
 In Lynch v. Donnelly, --- U.S. ----, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Supreme Court reaffirmed the relevance of what had generally been known as the Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), tripartite test.[13] Under Lemon, a state action or enactment does not violate the establishment clause if (1) it has a secular purpose; (2) its principal or primary effect is neither to advance nor inhibit religion; and (3) it does not foster excessive governmental entanglement with religion. Id. at 612-13, 91 S.Ct. at 2111-12. Although clarity, in the current context, would be aided by substituting "non-religious" for "secular," none of these factors supports a finding of impermissible establishment in this case.
 
 
 63
 In a somewhat novel twist on the issue of entanglement, plaintiffs claim that
 
 
 64
 [t]his is not a case where we must show that the State has been too intertwined with religious agencies. In this case, the State is the agency of (anti-)religion. It is hard to become more entangled than that.
 
 
 65
 Appellants' Brief 44. This conclusion, however, is entirely dependent upon the fallacious dichotomy discounted above. The Learning Tree was neither purchased from nor provided by official humanist organizations. Nor does the work carry the imprimatur of these or similar religio-philosophical bodies.[14] There is no entanglement.
 
 
 66
 Nor was selection and subsequent retention of the work impermissibly sectarian. The Supreme Court
 
 
 67
 has invalidated legislation or governmental action on the ground that a secular purpose was lacking ... only when it has concluded that there was no question that the statute or activity was motivated wholly by religious considerations.
 
 
 68
 Lynch, --- U.S. at ----, 104 S.Ct. at 1362 (emphasis added).
 
 
 69
 Here, there is no question that the book was included within the curriculum for the entirely non-religious (i.e., secular) and commendable purpose of exposing students to different cultural attitudes and outlooks.[15] In marked contrast to the orchestrated prayer, mandatory Bible reading, Decalogue, or creationism cases,[16] the record is devoid of any evidence that The Learning Tree was initially selected by Cassie's teacher or subsequently retained by Mead School District officials out of hostility toward Christianity or fealty to any secularist credo. "The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion." Lynch, --- U.S. at ----, 104 S.Ct. at 1368 (O'Connor, J., concurring). No such purpose has been shown.
 
 
 70
 The crux of plaintiffs' establishment claim is therefore that inclusion of The Learning Tree in the public schools has the primary effect of advancing the "religion" of secular humanism while inhibiting the plaintiffs' own religion of "Biblical Christianity." Plaintiffs, insist that "the book ... clearly teaches anti-Christian concepts, values, and beliefs." Appellants' Brief 16. Assuming, arguendo, that this characterization is correct, and that such views are consistent with the "religions" of humanism or secularism, " 'not every law that confers an "indirect," "remote," or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid.' " Lynch, 104 S.Ct. at 1364 (citing Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 771, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973)); see Crowley v. Smithsonian Institution, 636 F.2d 738, 742-43 (D.C.Cir.1980). Total separation of church and state is simply impossible. Lynch, 104 S.Ct. at 1362. The first amendment is not violated merely because particular governmental activity " 'happens to coincide or harmonize with the tenets of some or all religions.' " Harris v. McRae, 448 U.S. 297, 319, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980) (citing McGowan v. Maryland, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961)).
 
 
 71
 The issue is not whether The Learning Tree embodies anti-Christian elements; I have assumed, arguendo, that it does. Instead, the issue is whether its selection and retention by school officials "communicat[es] a message of government endorsement" of those elements.[17] It is not the purpose of the public schools "to cultivate an official faith or ideology, whether religious or humanistic in character...." Kauper, "Prayer, Public Schools and the Supreme Court," 61 Mich.L.Rev. 1031, 1066 (1963).[18] Yet even the Bible may occupy a place in the classroom, provided education and exposure do not become advocacy or endorsement. Abington, 374 U.S. at 225, 83 S.Ct. at 1573.
 
 
 72
 In assessing whether inclusion of The Learning Tree communicates governmental endorsement or approval of its purportedly "anti-Christian" or "secular humanist" elements, we must first examine the work as a whole. See Lynch, 104 S.Ct. at 1362. The passages identified by plaintiffs are simply scattered references to religion in a much larger work depicting a poor, black adolescent's painful process of coming of age. Nor are these passages as much theology as anthropology, less commentary on religion than comment prompted by the frustrating confrontation of adolescents with evil, hypocrisy, and suffering. See Appendix. Indeed, while that distinction might be lost on third-graders, it is bound to be understood by Cassie Grove's classmates--high school sophomores confronting many of the same questions, and doubtless beginning to appreciate that many of the comforting assumptions and illusions of childhood are not always what they seemed.
 
 
 73
 Second, we must examine the work as a whole in the context of the entire curriculum.[19] Were the school board in Cassie's district to require local principals to read over their public address systems a resolution, drawn in words from the book, declaring Jesus Christ to be a "poor white trash God," or "a long-legged white son-of-a-bitch," Appendix, infra at 1547 and 1549, there would be little doubt that the effect would be to communicate governmental endorsement of anti-Christian sentiments.
 
 
 74
 By contrast, The Learning Tree bears the sole signature of its author, Gordon Parks. It is a work of fiction, not dogmatic philosophy. It is one book, only tangentially "religious," thematically grouped with others in the sophomore literature curriculum. Its purpose and effect is to expose students to the attitudes and outlooks of an important American subculture.
 
 
 75
 Plaintiffs may be correct in suggesting that the work "hard[ly] ... constitutes the objective study of Christianity," Appellants' Brief 22, yet objectivity in education need not inhere in each individual item studied; if that were the requirement, precious little would be left to read. Instead, objectivity is to be assessed with reference to the manner in which often highly partisan, subjective material is presented, handled, and "integrated into the school curriculum, where [even] the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." Stone, 449 U.S. at 42, 101 S.Ct. at 194; see Abington, 374 U.S. at 225, 83 S.Ct. at 1573.
 
 
 76
 Luther's "Ninety-five Theses" are hardly balanced or objective, yet their pronounced and even vehement bias does not prevent their study in a history class' exploration of the Protestant Reformation, nor is Protestantism itself "advanced" thereby. The study of Greek mythology does not "advance" pantheism. Teaching about "the divine right of kings" does not endorse a particular dogma, although one is necessarily explored.[20]
 
 
 77
 Similarly, inclusion of The Learning Tree as representative of a particular literary genre neither religiously inhibits nor instills, but simply informs and educates students on a particular social outlook forged in the crucible of black rural life. To include the work no more communicates governmental endorsement of the author's or characters' religious views than to assign Paradise Lost, Pilgrim's Progress, or The Divine Comedy conveys endorsement or approval of Milton's, Bunyan's, or Dante's Christianity.[21]
 
 
 78
 Even though The Learning Tree does not "advance" secular humanism, it remains to consider whether the work "inhibits" fundamentalist or Biblical Christianity, as plaintiffs contend. There is, at least initially, apparent merit to this claim. When the work does discuss religion, it does so in a fashion which generally denigrates the figure of Jesus and casts doubt upon much fundamentalist doctrine--from the efficacy of prayer to the inerrancy of Scripture and benevolence of God. See Appendix. Nevertheless, in the context presented, these passages do not offend the establishment clause.
 
 
 79
 First, the work's purported hostility to religion may be more apparent than real. It is true that religious hypocrisy is one theme in the work. See Appendix. Yet the same might be said of both Jesus and the Old Testament prophets,[22] let alone such secular--and celebrated--authors as Chaucer, Voltaire, Paine, Twain, or Sinclair Lewis.[23] It is also true that the adolescent protagonist in the The Learning Tree comes to doubt and question many of the simple pieties he has been taught. In the novel, the good die young while the wicked prosper, prejudice reigns, the innocent suffer; these circumstances lead to searching questions and nagging doubts. See Appendix. But they are not new questions; Job asked them as well.[24] Neither do they reflect hostility toward religion.[25]
 
 
 80
 Of course, plaintiffs may personally espouse and prefer an unwavering acceptance of a number of the traditional religious doctrines doubted by characters in The Learning Tree. The issue, however, is not whether the work disapproves of any particular religious vision, including plaintiffs', but whether its inclusion in the public school curriculum indicates, intentionally or not, that the government joins in that disapproval.
 
 
 81
 It is true that The Learning Tree poses questions and ponders doubts with which plaintiffs may be uncomfortable. Yet to pose questions is not to impose answers. Since the first amendment is designed as much to protect the former as prevent the latter, I cannot conclude, on the record presented, that use of The Learning Tree inhibits religion.
 
 II. Free Exercise Clause
 
 82
 Plaintiffs allege that they believe that "eternal religious consequences" result to them and their children from exposure to The Learning Tree or discussion of it. That allegation[26] would probably be sufficient to present a free exercise question if Cassie Grove had been compelled to read the book or be present while it was discussed in class. She was not.[27]
 
 
 83
 Plaintiffs' free exercise claims appear to go further, however, and to contest the inclusion of the book in the curriculum whether or not Cassie Grove was excused. The free exercise clause does not go nearly so far. While it protects individuals from governmental interference with their religion in the absence of compelling justification, see Wilson v. Block, 708 F.2d 735, 740 (D.C.Cir.), cert. denied, 104 S.Ct. 371 (1983). Callahan v. Woods, 736 F.2d 1269, 1272 (9th Cir.1984), it does not protect the individual from being religiously offended by what the government does.
 
 
 84
 Plaintiffs' submissions to this court make clear that they regard The Learning Tree as but a single symptom of a larger social disease: the wholesale secularization of society. As one prominent theologian has observed,
 
 
 85
 what is meant when people speak of a "secular" ... world [is that] it seems that ... more or less all the important spheres of human life--learning, economy, politics, law, state, culture, education, medicine, social welfare--have been withdrawn from the influence of the churches, of theology and religion, and placed under the direct responsibility and control of man...
 
 
 86
 H. Kung, On Being a Christian 26-27 (1974). While plaintiffs are free to decry this secularization, and to resist, insofar as possible, its alleged perniciousness in their private lives, it is inevitable that in such a society, plaintiffs will find much with which they disagree.[28]
 
 
 87
 The inevitability of this conflict between plaintiffs' religious rejection of "secularism" and the secularization of society suggests why antipathy alone, however sincere, is never enough to sustain a free exercise challenge. Plaintiffs are religiously offended by a particular novel; others previously before us have been religiously offended by Trident submarines or the nuclear arms race.[29] Were the free exercise clause violated whenever governmental activity is offensive to or at variance with sincerely held religious precepts, virtually no governmental program would be constitutionally possible.
 
 
 88
 When the contention is applied to education, Justice Jackson's admonition is especially appropriate:
 
 
 89
 Authorities list 256 separate and substantial religious bodies to exist in the ... United States.... If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds. Nothing but educational confusion and a discrediting of the public school system can result....
 
 
 90
 McCollum v. Bd. of Educ., 333 U.S. 203, 235, 68 S.Ct. 461, 477, 92 L.Ed. 649 (1948) (Jackson, J., concurring). The lesson is clear: governmental actions that merely offend or cast doubt on religious beliefs do not on that account violate free exercise. An actual burden on the profession or exercise of religion is required. See Wilson, 708 F.2d at 741.
 
 
 91
 In short, distinctions must be drawn between those governmental actions that actually interfere with the exercise of religion, and those that merely require or result in exposure to attitudes and outlooks at odds with perspectives prompted by religion. Plaintiffs allege that they believe that "eternal religious consequences" would result from Cassie Grove's exposure to The Learning Tree. Such a belief might well require her being excused from such exposure. See note 26, supra. Mere offense, however, would not require her being excused, nor does mere offense at having The Learning Tree in the curriculum bring the free exercise clause to the aid of plaintiffs. There has been no violation of free exercise in this case.[30]
 
 III. Conclusion
 
 92
 We must remain sensitive to claims that government is either interfering with a religion or is supporting a competing religion. See Crowley v. Smithsonian Institution, 636 F.2d at 743. Neither is the case here. On the contrary, if we were to grant the relief sought by plaintiffs and remove The Learning Tree from the curriculum because of plaintiffs' hostility to its ideas, our action would itself threaten first amendment values. "Our Constitution does not permit the official suppression of ideas." Bd. of Educ. v. Pico, 457 U.S. 853, 871, 102 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982) (Brennan, J.) (plurality opin.). We are bound to respect that command as well.
 
 APPENDIX
 
 93
 To illustrate their objections to The Learning Tree, appellants appended fifteen separate passages from the work to their opening brief. Because analysis under the establishment clause is pre-eminently fact-dependent, see Lynch v. Donnelly, --- U.S. at ----, 104 S.Ct. at 1361-62, I have appended the most relevant portions of those passages.
 
 Passage 1
 
 94
 Jack Winger was a poor man, but the supper he blessed that night was of things Newt liked best--fried chicken, yams, browned clabber gravy and cornbread. Immediately the talk centered around the big storm and its casualties.
 
 
 95
 "Jim was a fine fella, one of the best round here."
 
 
 96
 "How long'd you know him, Poppa?"
 
 
 97
 "Well on to twenty years, ain't it, Sarah?"
 
 
 98
 "Closer to twenty-three, if mem'ry serves me right--use your fork, Newt! Seems he came about two years after us."
 
 
 99
 "Funny thing," Newt said, "old Collie was right 'side him and didn't even git scratched. How you figger that, Poppa?"
 
 
 100
 "The Lord works in funny ways. Just wasn't the dog's time to go--pass the gravy, Prissy--was Jim's time. Simple as that."
 
 
 101
 "Anybody hear from Uncle Rob?"....
 
 
 102
 Sarah was about to answer when Pastor Broadnap appeared at the screen door. "O-ho," he beamed, "caught you sittin' for supper!"
 
 
 103
 The rotund minister swept into the room, his long black preacher coat flapping at his knees. Little pods of sweat stood out on his forehead at the point where the hairline receded sharply, as if it were shaved. He scanned the table. "Just in time to share the gifts of the Lord," he said.
 
 
 104
 "Oh my," Newt mumbled, "there goes my chicken legs."
 
 
 105
 ....
 
 
 106
 "Bless you, Jack. Bless you." He was flooding the cornbread with gravy now. "Well," he continued, chewing, "I attach a very special meanin' to that storm. It's (Newt winced as Broadnap teethed the meat from the bone) a warnin' to the wrongdoin' of all these sinners round here. This place is poppin' with sin--people drinkin', cuttin', fightin' and doin' all sorts of things the Lord don't approve of; nobody comin' to church like they ought'a. Why, I'd say Chappie Logan's place got more drunks in it than we got members on Sunday mornin'."
 
 
 107
 Sarah Winger looked at the pastor and said, "For some reason it's the good ones who go first."
 
 
 108
 "Thinkin' 'bout Jim Pullens, huh, sister Winger?" Broadnap said, dipping into the jar of apple butter with his knife. "Well, it's hard to explain--hard to explain. Jim was a fine man. Always come to church and prayer meetin'. Only way I figger it is that the Lord takes the good ones like that so the bad ones'll hafta take more responsibility."
 
 
 109
 "Old Sam Wong got it too. They ain't found him yet, I hear."
 
 
 110
 "Naw, and with half that block on top of him they might not find him for a couple of days," Pete said. "And to think he was out safe, then went back for his cat and got killed."
 
 
 111
 "Well, you find out lots 'bout people in a big wind like that. Some proves weak, some proves strong." Jack Winger wiped his long mustache with his wrist and pulled his pipe from his pocket. "It's a easy time to cut lamb from sheep. Think God does prob'ly send things like this to test us. Wouldn't be surprised if he didn't get tangled up hisself tryin' to figger out these here folks in Cherokee Flats."
 
 
 112
 ....
 
 
 113
 "Now, Newt, you been studyin' your Sunday school lessons lately?"
 
 
 114
 Newt gulped, "Yessir, I--"
 
 
 115
 "Fine. Now if you tell me the name of the weapon Samson slew the Philistines with, the leg's yours." Broadnap grinned smugly.
 
 
 116
 Newt scratched his head in deep thought (Slingshot ... naw, that was David ... spear ... naw ...). "I got it!" he blurted out. "The jawbone of a--a--" He looked sideways at his mother.
 
 
 117
 "A what?" Broadnap snapped.
 
 
 118
 A wry smile wrinkled Newt's face. "Well, I can't name it right out, but it's the same name as that part left on the platter."
 
 
 119
 "The ass," Broadnap grunted, dumping the leg on Newt's plate, "the jawbone of an ass."
 
 
 120
 Everybody laughed.
 
 
 121
 "Newt," Sarah admonished, "you shouldn't take that leg from Reverend Broadnap. Now--"
 
 
 122
 "Oh no, sister. The boy won it fair 'n square. I'll take what's left," Broadnap countered, spearing the chicken rump from the platter.
 
 
 123
 ....
 
 
 124
 "You been over to see the little Johnson girl, Reverend?"
 
 
 125
 "Yes, sister Sarah. That child's lucky to be livin'. Hardly any hair or skin left on her. Doc Cravens says we got to ask for some volunteers in church Sunday."
 
 
 126
 "Volunteers for what?" Jack asked.
 
 
 127
 "Well, seems like Doc's gonna try to graft new skin on her. That means somebody's gonna have to give some'a theirs."
 
 
 128
 Sarah looked up in astonishment. "You mean Doc intends to strip skin off somebody else and put it on her?"
 
 
 129
 "That's what he's sayin', sister Sarah, if she's gonna live any kind'a normal life again."
 
 
 130
 "Poor child. It's a awful thing--a awful thing." Sarah said, shaking her head.
 
 
 131
 "Don't worry, sister Sarah, she'll be helped. Some good souls'll come forward."
 
 
 132
 "Hot coffee, brother Broadnap?"
 
 
 133
 "No, Jack. Ain't been sleepin' too well lately. Next time round, maybe. Got some more visitin' to do on my way to the parsonage. Sister Pullens and a few others." He got up. Those about the table started to rise, but he spread his arms above them. "Sit, my dear children, and bless you, sister Sarah, for the wonderful repast." He plucked several toothpicks from a bowl and picked up his black "preacher's" hat from the sideboard. As he passed Newt he patted him on the head. "Keep studyin', boy. Givin' the right answer meant that chicken's leg instead of the part that went over the fence last." He chuckled. Then he plopped the hat on his head and left as suddenly as he had come.
 
 Passage 2
 
 134
 ....
 
 
 135
 He thought, "What are grasshoppers for anyway, and snakes and mosquitoes and flies and worms, wasps, potato bugs and things? Seems they ain't much good to the world, but God put 'em here. Seems they got as much rights as we have to live. If the grasshoppers didn't eat the crops, they'd starve. No worse'n us killin' hogs and chickens so we don't go hungry. Hogs and chickens and cows and rabbits and squirrels, possums and such must hate us much as we hate mosquitoes and gnats and flies. Dogs and cats and horses are 'bout the luckiest. 'Bout the only ones we don't go round killin' off all the time. The Ten Commandments say we oughtn's kill, then we come home from church and wring a chicken's neck for dinner--and Reverend Broadnap eats more'n anybody else." Newt stretched. "Too much for me to figger out," he said aloud.
 
 Passage 3
 
 136
 ....
 
 
 137
 "Momma, can I ask you somethin'?"
 
 
 138
 "Yes, boy. What you want to ask me?"
 
 
 139
 Newt pondered briefly, and Sarah slowed her pace. "Well, I don't know offhand, just about people and things like that."
 
 
 140
 Sarah smiled to herself, for she remembered that for the past year she had wanted to talk with Newt about "people and things" but thought him too young to understand the things she wanted to speak of. She had planned especially for him, her youngest, since the day he was born, but in the trials of living and caring for all the others she found it hard to clarify and formulate these plans. Now she welcomed the breakthrough. "Newt, you just ask me anything you want and I'll try to answer you."
 
 
 141
 "Well, after the storm, Poppa said that the storm and the people killed and everything was the doin' of God. You care if I ask you why he kills some people and not the others? Poppa said hisself that Mister Pullens was a good man. And why did some of the town git torn up and the rest didn't?"
 
 
 142
 Sarah Winger came to a complete stop, and Newt was instantly afraid he had offended her. He took a step beyond his mother, his face pointed straight ahead, eyes lowered and cast sideways for the reaction. Her lips parted, but she didn't speak immediately; then she started moving again.
 
 
 143
 "Newt."
 
 
 144
 "Yessem."
 
 
 145
 "You know your poppa and me are religious people, don't you?"
 
 
 146
 "Yessem."
 
 
 147
 "Well, it would be real easy for me to say, you don't question the ways of God--and I was tempted to--but I know deep in my heart that there's more to it than that. It's true he guides us. But we cain't depend on him for everything. We gotta do things for ourself. Now, maybe if Jim had built himself a storm cellar or a stronger house, he wouldn't a got killed so easy. And if little Fannie Johnson's momma hadn't been drunk, she'd a held onto that lamp and her daughter wouldn't a got burnt. It's like I say, we got to do some things for ourself. If you got a battle to fight, you cain't rightfully ask the Lord to help you and not the other fella. Now can you?"
 
 
 148
 "No, ma'am."
 
 
 149
 "No, son, you got to fight and hope God likes the way you're using your fists. And that goes for the boy you're fightin'. Ain't neither one of you got time for prayin' while you're flingin' fists. Too many people, especially some of ours, boy, sit round waitin' when they should be out doin'. You got to always remember that, boy, always."
 
 
 150
 "Yessem. Are we gonna live here all our life?"
 
 
 151
 Sarah looked searchingly at him. "Don't you like it here?"
 
 
 152
 "I don't know, Momma. I ain't never been no place else."
 
 
 153
 "I hope you won't have to stay here all your life, Newt. It ain't a all-good place and it ain't a all-bad place. But you can learn just as much here about people and things as you can learn any place else. Cherokee Flats is sorta like a fruit tree. Some of the people are good and some of them are bad--just like the fruit on a tree. You know that, don't you, boy?"
 
 
 154
 "Yessem."
 
 
 155
 "Well, if you learn to profit from the good and bad these people do to each other, you'll learn a lot 'bout life. And you'll be a better man for that learnin' someday. Understand?"
 
 
 156
 "Yessem."
 
 
 157
 "No matter if you go or stay, think of Cherokee Flats like that till the day you die--let it be your learnin' tree."
 
 
 158
 "Do we all have to die someday?"
 
 
 159
 "That's one thing we all have to do, boy. No matter who you are. That's why it's so important to be ready when your time comes."
 
 
 160
 "You mean to be a Christian, like you and Poppa?"
 
 
 161
 "In a way--in a way. But it's even more than sayin' you're a Christian. It's a matter of givin' more to this world than you take away from it. So when you die you don't owe it anything. It's bein' able to love when you want'a hate--to forgive them that work against you--to tell the truth even when it hurts--to share your bread, no matter how hungry you are yourself. Dyin' comes easy when you know you've done all these things right."
 
 
 162
 "I'm gonna hate dyin'."
 
 
 163
 "Won't none of us like it, boy--none of us."
 
 
 164
 "I hate dyin' so much I wish sometimes that I wasn't even born."
 
 
 165
 Sarah blurted, "Why, I'm surprised at you sayin' such a thing." When she saw his face she knew he realized that she was stalling for time.
 
 
 166
 "Is there anybody who has ever come back from death that saw heaven?"
 
 
 167
 Sarah sighed (Who's this boy been talkin' to? Where's he gettin' such notions?) "No, boy. Ain't no such thing as that ever happened, to my knowin'."
 
 
 168
 "Well then, how does anybody know there is such a place?"
 
 
 169
 Her mind's eye flashed frantically from Matthew to Revelations, criss-crossed ages of praying, of shouting and of preaching. And finally her lips betrayed her teaching, ages of it--made light of the blindness, broke with believers; with the mountains of ever-so-solid faith. "Newt." (And already her expression made him sorry he'd sprung the trap.) "Honestly, I don't know. Maybe there ain't no hell either. Maybe there ain't no gold thrones in the clouds and maybe there ain't no pits of fire tended by a devil with a pitchfork tail. I honestly think God made us and expects us to do some good while we're here on earth. I cain't even say that God's his real name, but it's good as any. It means Almighty."
 
 
 170
 Confusion disturbed her thoughts. "All my life I've been told there is a better place beyond this one, Newt. And I guess I'll go to my grave believin' it. Such believin' has kept our family goin' when there wasn't much else to go on." She paused for a moment. Swallows, flying low and fast, fluttered the stillness. Then she spoke. "These are the things I was taught. It's awful hard now, this late, not to believe them." They didn't talk after that.
 
 Passage 4
 
 171
 ....
 
 
 172
 Wham! The blast came as he fumbled with the other strap (sounded like a double-barreled shotgun ...). He got to his feet, leaped over the bed, then, ever so cautiously, peeped out the window. It was Clint, on top the overturned chicken house, reloading the gun and hollering, "I'll git the son-of-a-bitch yet! I'll git him!"
 
 
 173
 Newt started for his mother's room, but she was already rushing to the kitchen door. Newt followed her. Pete's voice ricocheted against Prissy's. "Who's shootin'? What the matter? Momma! Momma! What's goin' on? Come back here, Newt! Somebody's shootin' out there!"
 
 
 174
 "It's Clint. He's still drunk!" Newt hollered, slyly enjoying the early excitement. And as he ran out behind his mother, he saw Clint blast away at the sky. Wham! "I'll get the son-of-a-bitch!" Wham!
 
 
 175
 Sarah Winger didn't stop until she was at the foot of the chicken house. "What you call yourself doin', boy? Who're you shootin' at?" Her tone was in keeping with the Sabbath.
 
 
 176
 Clint rocked around unsteadily, reloading the gun. "I'm gonna git him! Don't worry. I'm gonna git him!"
 
 
 177
 "Git who? Who you shootin' at, boy?" she shouted.
 
 
 178
 Clint wobbled precariously, pushing in the shells. "I'm gonna blow the ass off Jesus Christ, the long-legged white son-of-a-bitch! I burned him a little that last shot. I'll git him for shore this time!"
 
 Passage 5
 
 179
 ....
 
 
 180
 "He's a thinkin' boy, Jack. You should'a heard some of the questions he asked me about religion and death. I was hard put for the right answers, I'll tell you."
 
 
 181
 "Religion and death?"
 
 
 182
 "That's right, religion and death."
 
 
 183
 "I declare, he's gittin' crazy notions from someplace."
 
 
 184
 "His questions wasn't just crazy notions. They made me do a lot of thinkin' afterward. They were about things I used to wonder about when I was a girl, but didn't talk about just because I was scared to, for some reason or another."
 
 
 185
 "Well, one thing 'bout death, when your time comes, you're goin', and that's that. Ain't very hard to answer that."
 
 
 186
 "It ain't just dyin' he wonders about. It's what comes after."
 
 
 187
 "He needs to go to church more, maybe."
 
 
 188
 "We been goin' to church all our lives, and so has he; still hearin' the same things we been hearin' since we was his age. The answers that used to satisfy us ain't goin' to satisfy Newt and the young ones comin' up now. They want proof. Some kind they can see and feel. And they're goin' to want more out of this world than we're gettin' out of it. Time's changin', Jack."
 
 
 189
 "This is a white man's world, Sarah. Ain't no time goin' to change that."
 
 
 190
 "No, maybe time won't, but this new crop of colored boys and girls will. You and me prob'ly won't live to see it, but these kids comin' along today are goin' to find a way to change things."
 
 
 191
 "The white man's got the money and guns--that spells power."
 
 
 192
 "There's more'n one way to skin a cat, Jack. Schoolin's more powerful than guns or money in the end. I honestly hope someday Newt'll git out of here and go where chances will be better for him. I pray for that."
 
 Passage 6
 
 193
 ....
 
 
 194
 "Now, my good children, look at me. Cast your eyes upon the servant of the Lord! Look at me." (Newt feels his mother's eyes upon him--and his shoulders lean back to the time-polished bench, his eyes are stubbornly toward the pulpit.)
 
 
 195
 Suddenly Broadnap hunches his shoulders, extends his long arms from his coat sleeves, points his index fingers at the congregation. His head, hawklike and fierce, juts forward. His eyes, burning under sweat-drenched brow, search the upturned, hypnotized faces. "Look at me and tell me, my dear children, what's your life? ... think about it in the bright of day and the black of night! ... what's your life? (his fingers recoil into his fists--his arms drop: the tempo breaks and calm begins to return; the choir is singing, "What a friend we have in Jesus") ... Thank you, dear God who giveth us life through our Lord, Jesus Christ ... bless you, my children, and lest we forget His kindness to us during this awful tragedy--let us pray." (The congregation, spent and still moaning, bows in silent prayer. Newt slumps forward again and brings his mind to the fried chicken that always comes with the Sabbath.)
 
 
 196
 Reverend Broadnap raises his arms again, this time for sinners and confessioners. Several are going forward--Fred Jenkins, Clara Brown and Otis Moses. Now everybody's curiosity is up, because Lester Saunders (he's wearing them white spats) is raising his head for confession. "What can God do to make me understand myself?" he asks.
 
 
 197
 Broadnap, mopping his brow, looks down at him. "What's troublin' you, son?"
 
 
 198
 "I don't like women." The church is very still.
 
 
 199
 "You don't like women?"
 
 
 200
 "No, I don't like women."
 
 
 201
 "How long have you been like that, brother Saunders?"
 
 
 202
 "Ever since I was a man."
 
 
 203
 Broadnap's thumbing his Bible. "Don't worry or be ashamed, brother Saunders. God acts in many ways. It may be your conviction." Now he stops and reads from the Bible--from Romans, 14th Chapter, " 'One man hath faith to eat all things; but he that is weak eateth herbs. Let not him that eateth set at nought him that eateth not; and let not him that eateth not, judge him that eateth: for God hath received him. Who art thou that judgest the servant of another? To his own Lord he standeth or falleth.' "
 
 
 204
 Lester is looking the minister straight in the eye. He turns and looks at the congregation. His left eye is damp. Now he is walking very fast, switching-like, down the aisle. Sadness is on his face. He's pushing through the swinging doors at the rear of the church. They swish back and forth--and he is gone. It is still very quiet. Reverend Broadnap raises his arms above the others and begins to bless them into the church--and again the choir is singing, "What a friend we have in Jesus."
 
 Passage 7
 
 205
 ....
 
 
 206
 "Help him up, boy. Git him to the house. He's so drunk he can hardly stand up, let alone shoot anybody." Newt bent down and helped Clint to his feet, and the three of them went back to the house.
 
 
 207
 As they entered, Newt saw Rende peeping at the bedroom door. When she heard her husband groan and collapse to the floor, she crept back into the parlor with Busty and Gin-gin in time to see her mother hide the gun behind the china cabinet.
 
 
 208
 Jack threw some more coal in the fire and spat in the scuttle. "Just look at him" he said in a half growl, "his maw and paw shore wasted a night when they made him."
 
 
 209
 ....
 
 
 210
 Rende wept. "What am I goin' to do, Momma? What am I goin' to do?"
 
 
 211
 Sarah put her arms about Rende's shoulders. "We've just got to pray over him, that's all. We've got to keep prayin' "
 
 
 212
 Jack blew out a ring of smoke. "I declare, prayin' ain't gonna do that varmint no good, none a'tall."
 
 
 213
 "Jack, I want you to stop talkin' like that. You know--"
 
 
 214
 "I'm tellin' you, Sarah--Clint's lost. God and the devil's both quit strugglin' for him, so it ain't much nobody else can do--I don't care how long and how loud they pray." He knocked his pipe on the coal scuttle and some loose ashes fell out. "He's lucky it's you who handles him. If it's ever me who has to take that gun away from him, he ain't gonna find it so easy. Fact is, he's gonna end up with a cracked skull."
 
 Passage 8
 
 215
 Christmas at Spit's School for Boys wasn't much different from any other day....
 
 
 216
 Marcus ate alone in the dimness of his cell.
 
 
 217
 ....
 
 
 218
 He had just settled back on the cot when Crapper hollered, "You got some visitors, Savage! Git up and try lookin' happy."
 
 
 219
 "Screw you." Marcus growled sullenly.
 
 
 220
 "Fool with me and you don't see nobody," Crapper warned.
 
 
 221
 "I don't give a goddam. Ain't nobody I want to see nohow."
 
 
 222
 But by now the visitors were coming down the corridor.
 
 
 223
 "Right this way, Rev'rend," Crapper said. He spoke with an exaggerated politeness that forced a grunt of disgust from Marcus. The cell door swung open and through it came Reverend Broadnap, Maggie Pullens--carrying a bag of fruit and candy--and Deacon Henry Fuller. Reverend Broadnap stepped over and touched Marcus on the shoulder. Marcus stiffened. He wanted to tell them all to go, but he held his tongue.
 
 
 224
 "We come to pray for you and to wish you a merry Christmas, son." He didn't answer, and Broadnap turned to the others and said, "Let's pray."
 
 
 225
 They knelt on the floor. Marcus' fingernails dug into the palms of his hands and his teeth ground together in an angry embarrassment. He kept his eyes low and straight ahead, as if ignoring their presence.
 
 
 226
 "Oh Almighty God," Broadnap began, "we come to you on bended knee prayin' for the soul of this young sinner." Marcus' muscles flexed and his gaze shot defiantly to the tops of their heads, then to Crapper, who stood in the doorway with an evil grin on his face. "Wash his black sins away in these white snows of your holy Christmas. Lighten the troubles he has brought to his young dark days. Bring peace to his tormented soul and help him to someday leave this place a cleaner and better young man. Oh God, show him the light. Show--"
 
 
 227
 "Shut up! Shut up!" Marcus shouted, "and git the hell out'a here!" He was on his feet now. "I don't want'a hear none of your Uncle Tom prayin' over me!" The three people rose, shocked beyond belief.
 
 
 228
 "You don't know what you're sayin', boy," Broadnap half whispered, trying to quiet him down, reaching again toward his shoulder.
 
 
 229
 "I know much 'bout what I'm sayin' as you do," he shot back, pulling away.
 
 
 230
 Maggie put the bag of fruit on his bed. Broadnap took out a Sunday school card with the picture of Christ on it and placed it on the table. "Read the scripture here on the back, son," he said, "and pray to the Savior. He'll hear you."
 
 
 231
 Marcus snatched the card, tore it in half and threw it at the preacher. "You and your white God git the hell out'a here!" he shouted. "I don't want no part of you soul savers--bendin' down, like Paw says you do, kissin' the feet of a poor white trash God." Tears were in his eyes now. "Look at Crapper there! He's white! Whyn't you git down and start moanin' and groanin' to him, so he can kick the crap out'a you like he does all us 'nigga' boys. Yeh, that's what he calls us--nigga! nigga! nigga! Tell 'em, Crapper. Tell 'em what you gonna do to me when they leave! Tell 'em."
 
 
 232
 "Son--"
 
 
 233
 "Don't son me. Just git goin'! So Crapper can tease me 'bout you niggas comin' here to pray over me!"
 
 
 234
 Broadnap, Maggie and Henry Fuller filed out, their heads shaking. Crapper slammed the door shut and followed them down the corridor. Marcus sat very still awhile, then suddenly he began to feel a deep sense of guilt, deeper than any he had ever felt in his whole life. He was bewildered. These people had come all that way to help him and he had hurt them, said things he didn't realize he could say. But what he'd said was more for Crapper than for them, he realized. If Crapper hadn't stood in the door with that silly grin on his face, things might have been different. But it was too late now. The harm was done. Yet, somehow, he felt he had got a point across to Crapper. he didn't know just what. Maybe he was really defending those people against somebody like Crapper, who had once told him, "All niggas are stupid and crazy." In a way he was telling him that they weren't, that he was on to his kind and their "lily-white God" that his paw damned when he got drunk.
 
 
 235
 He glanced up. Crapper was back. Marcus said nothing.
 
 
 236
 "Merry Christmas--nigga," Crapper said disdainfully, and turned back down the corridor.
 
 
 237
 Marcus was silent. His head fell back in the shadows and he closed his eyes, trying to form the image of a God with black skin, thick lips and coarse hair like his--but he couldn't. The image on the torn card at the foot of his bed had been implanted much too long before. It was difficult to erase that image now, or even substitute another one for it.
 
 Passage 9
 
 238
 "IT WAS AWFUL the way that Savage boy talked to us--simply awful," Maggie Pullens told Sarah as the two of them sat in the Winger front room that night.
 
 
 239
 Sarah thought for a while before answering, then she spoke what she knew to be the truth. "It ain't really the boy's fault, Maggie."
 
 
 240
 "Then whose is it, for the good Lord's sake?"
 
 
 241
 "That could've been Newt, Beansy, Earl or any of the other young ones around here. If we want to tell the truth about it, then we would say it's our fault--all the Christians, black and white, and teachers and officeholders and everybody who's supposed to have good in them."
 
 
 242
 "Yes--yes, you're right, Sarah. Guess you're right."
 
 
 243
 "Our young children's minds here are mixed up. This place with all its drinkin' and fightin' and murderin'--Jim Crow schools, picture shows and eatin' places is too much for these young ones to figure out. They've got bigger ideas about livin' than you and me had at their age, Maggie."
 
 
 244
 "We're in a rut for shore."
 
 
 245
 "We was born in a rut, and the reason we've been able to keep goin' is because we always thought someday we're goin' to git out of it. I ain't one to fool myself about my chances any more, but I'm goin' to do all I can to see that my children don't get bogged down here forever."
 
 
 246
 "It's a big problem, all right."
 
 
 247
 "Take that Savage boy--nobody's ever done anything big to help him. He should've been taken away from Booker when he was a little boy and put in a good home. There just ain't much good can come of him now."
 
 
 248
 "The only people tryin' to do anything a'tall is our church missionary society."
 
 
 249
 "That's true, Maggie, but it's mighty hard trying to push out misery and fill empty stomachs with the word of God. Booker Savage asked me one day if we had a Jim Crow heaven waitin' for our saints."
 
 
 250
 "That man's awful--just awful."
 
 
 251
 "Told me Chappie Logan was 'his god. 'Least he's black like me.' he said."
 
 
 252
 "Awful--just awful," Maggie moaned. A moment later she got up to leave. "Well, I have to be moseyin' on. Tired after that long trip up there."
 
 Passage 10
 
 253
 The crowd had grown ugly and boisterous. They were already making their bets. If he quit now no one would understand, and everyone would think he was a coward. If he didn't fight, he might take a worse beating from the crowd than he would from Marcus. He wanted to ask God to help him fight to win, but he suddenly remembered his mother's telling him on the river road, many nights back, that God couldn't favor one fighter against another. He thought next of Pete, wished he were there. The lesson began to come through (cock the right--jab with the left--feint him out of position--jab--throw the right--).
 
 Passage 11
 
 254
 ....
 
 
 255
 He wondered, as he had often done before, what the whites' real reasons were for denying them a part in the school's athletic and social affairs. "Why does our color make such a difference? ... Didn't God know that we'd have a lot of trouble if he made us black? ... Since he's white, maybe he don't care either." He smiled wryly. "Never seen black angels ... even the chariot horses are white."
 
 Passage 12
 
 256
 "How'd you git over here so early?" Beansy asked.
 
 
 257
 "Got a new babe with a big new car," Skunk lied. "You ought to see her. She's got hair down to her ankles and a keester that would make old Rev'rend Broadnap throw his Bible in a privy hole."
 
 Passage 13
 
 258
 ....
 
 
 259
 Newt found himself repeating after the bailiff, "--to tell the truth and nothing but the truth, so help me God." He asked strength of something, be it God or whatever, to carry him, his family and the rest of the colored people safely through the trouble he now imagined his testimony would bring.
 
 Passage 14
 
 260
 NEWT SAT on a barrel in the corner of the kitchen, listening to the downpour vibrate the tin roof above him and watching Lou and Clara ready the evening meal. Realizing that if his mother died he might have to live with one or the other sister, he observed them closely--trying to decide which one he would rather be with. He liked them both, so he sat mentally sifting their habits and dispositions, applying them to his own simple, yet important, personal plans and desires. "Clara's a little bossy," he thought. "She'd prob'ly want me to stay in all the time--want to pick all my friends, too, but she likes to dress fancy--prob'ly help me get some keen things to wear. Lou's easygoin' and easy to fool. I like the way she fries potatoes, but she'd prob'ly want me to go to church all the time. Sure had enough religion to last me a long time."
 
 Passage 15
 
 261
 DAWN ARRIVED painfully slow, and Newt, as if in a trance, lay gazing out the window through the dank lace curtains. He watched the sky pale as the sun climbed to the foggy horizon and brightened the upper reaches. His mind, with unaccountable calm, explored the reality of this hour over the deep, uneven snoring of Roy and Pete, sleeping beside him.
 
 
 262
 Their mother was dead, he knew, but it was hard to believe. Suddenly he wondered if, somewhere up there in the pale blue nothingness, her soul--free of tortured body and earthly things--was already floating silently about, knowing at last the real purpose of its sojourn on a complex and troubled earth. What if she found that all the praying and religious rites were just a lot of folly; that her soul floated with no more righteousness or dignity than that of Doc Chency, Big Mabel, or even Captain Tuck? What a shock it would be to her!
 
 
 263
 He now thought uneasily of such a possibility, and he couldn't help but feel that this was more than likely the case--and the feeling shamed him. Then he softened his shame with the reasoning that if such were true, she would never begrudge anyone such equality. Whatever judgment settled upon her, he thought, would surely be the best that eternity could possibly extend.
 
 
 264
 As Newt dressed quietly, the sun burned through the fog, warming the wet rooftops, drying the leaves and grass. And the moist cool earth took in the heat and in return gave forth little curlings of cloud that quickly disappeared in the clean morning air.
 
 
 265
 He entered the dining room and looked around. Everything was just about the same, except the door which the shot had blasted. Stepping to it, he ran his fingers over the splintered surface. Daylight leaked through it now, and a sudden fright gripped him, for he realized that this destruction was actually meant for Rende. Remembering the gun against his father's head, he shivered and stepped back involuntarily (this could've been Poppa's skull), then he moved warily across to his mother's room. They had already taken her to the undertaker's.
 
 
 266
 The odor of camphor and medicine still hung in the air, and a bouquet of withered posies lay on the rocking chair in the corner of the room. The sheets had been removed, and the mattress was doubled upon the sagging springs. Above the antique dresser hung an oval-shaped photograph of his father and mother, framed in a polished, worn wood. It had been taken their wedding day, and both stared straight ahead--unmindful of this faraway moment when their last child would stand silent, alone and uncertain in this room of death.
 
 
 267
 Almost in every sense, Newt had come to link death with violence. Even his mother's passing, he thought, couldn't escape a brush with it. Nearly everyone he had known intimately, and who had ceased to live, met their demise in bloodshed. And it was probably for this reason that he feared death so much--and this fear, he reasoned, was childish. His mother's easy, tranquil and unflinching acceptance of death enhanced his respect for her. Now, this morning, it was creating within him a near-fanatical desire to rid himself of this stigma that had dogged his soul since the day of Doc Cheney's death.
 
 
 268
 Turning from the room, he channeled his thoughts into an imaginary rectangular hole that someday would be his grave. And his whole being reacted against the eternal blackness, the unending airlessness, the unchangeable recumbent position of his body--never to eat, taste, feel, speak or hear again. He shuddered. Now he envisaged the others reposing about him, acre after acre; worm-bored coffin sides, everlasting decay, dust piling forever upon eternal dust--entombed in the still, suffocating blackness.
 
 
 269
 Why, then, was life given, and for no logically explained reason taken away again? He recalled the rolling, wearisome voice of Pastor Broadnap. "--From dust you came and to dust you must returneth!" Newt remembered his authoritatively hollering such things over Big Mabel's coffin. He remembered, too, his swing about the pulpit, frock coat flying, sweat dripping, screaming of immortality--"of the spirit, of the soul"--not the good, solid body.
 
 
 
 [1]
 Neutrality is designed to protect religion as well as government. "[A] union of government and religion tends to destroy government and to degrade religion." Engel v. Vitale, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962)
 
 
 [2]
 Plaintiffs' position that government should be prohibited from establishing non-theistic ideologies in the schools, just as it is prohibited from establishing traditional theistic practices, is not without support. See Abington School Dist. v. Schempp, 374 U.S. 203, 313, 83 S.Ct. 1560, 1619, 10 L.Ed.2d 844 (1963) (Stewart, J., dissenting) (viewing refusal to permit religious exercises as arguably the establishment of a "religion of secularism"); Abington, 374 U.S. at 306, 83 S.Ct. at 1615 (Goldberg, J., concurring) (warning that "untutored devotion to the concept of ... noninvolvement with the religious" can become "a brooding and pervasive devotion to the secular"); see, e.g., Whitehead & Conlan, "The Establishment of the Religion of Secular Humanism and its First Amendment Implications," 10 Tex.Tech.L.Rev. 1 (1978); but cf. Davidow, "Secular Humanism as an Established Religion: A Response to Whitehead & Conlan," 11 Tex.Tech.L.Rev. 51 (1979)
 
 
 [3]
 "[T]he use of this book constitutes the advancement of a religious doctrine called secularism, Secular Humanism, or humanism.... We belief that the terms 'secularism,' 'humanism,' and 'secular humanism' can be used interchangeably...." Appellants' Brief 44 & 45
 
 
 [4]
 "Secular Humanism ... is a religion dedicated to affirmatively opposing or showing hostility toward Christianity. It has declared its pulpit to be the public school classroom and its 'bible' is adolescent literature like The Learning Tree." Appellants' Brief 49
 
 
 [5]
 Originally, "humanism" signified the recrudescence of interest in classical art and letters; a critical, liberal, and individualistic spirit; and the shift of emphasis from religious to secular concerns which blossomed during the Italian Renaissance. More generally, the term has come to signify any doctrine or set of values which rejects supernaturalism, asserts the essential dignity and worth of each human being, and commits itself to the achievement of individual self-realization and aggregate human welfare through reason and the scientific method. See 4 Ency. of Philosophy 69-72 (1967)
 
 
 [6]
 Historically, "[f]or all its antipathy toward asceticism and theology, humanism did not have an antireligious or anti-Christian character. Its interest in defending the value and freedom of man drew it into discussing the traditional problems of God and providence...--discussions that were frequently concluded in much the same form as that accepted by the medieval tradition." Ency. of Philosophy, supra n. 5, at 71. More recently, a number of celebrated theologians have viewed humanism not as the antithesis, but rather as the apotheosis of religion. Karl Barth, for example, declared that "there is no humanism without the Gospel" (cited in 5 Ency. Brittanica 199 (Micropaedia) (1982) ); see also K. Barth, The Humanity of God (1960); H. Kung, On Being a Christian 530-602 (1974). Others are united in their general rejection of the God of traditional theism as a God " 'up there,' " United States v. Seeger, 380 U.S. 163, 181, 85 S.Ct. 850, 861, 13 L.Ed.2d 733 (1965), and adoption of a more personal, humanistic vision of religion. See, e.g., P. Tillich, Systematic Theology (1957) (cited in Seeger, 380 U.S. at 180, 85 S.Ct. at 861); The Shaking of the Foundations (1948) (cited id., 380 U.S. at 187, 85 S.Ct. at 865); J. Robinson, Honest to God (1963) (cited id., 380 U.S. at 181, 85 S.Ct. at 861); D. Muzzey, Ethics as a Religion (1951) (cited id., 380 U.S. at 182-83, 85 S.Ct. at 862-63)
 
 
 [7]
 Theism--exemplified by traditional Judaism, Christianity, and Islam--is the "belief in the existence of one God who is viewed as the creative source of man, the world, and value...." Webster's Third New International Dictionary 2370 (1976)
 
 
 [8]
 The majority similarly suggests that "[s]ecular humanism may be a religion," citing Rhode Island Federation of Teachers v. Norberg, 630 F.2d 850, 854 (1st Cir.1980). Norberg, however, does not so hold. Instead, the First Circuit simply noted that even if secular humanism were to be so regarded, as plaintiffs urged, their suit to intervene nevertheless failed for failure to state a defense relevant to the challenged statute. Id. at 853
 
 
 [9]
 See generally J. Choper, "Defining 'Religion' in the First Amendment," 1982 U.Ill.L.Rev. 579, 581 & 604
 
 
 [10]
 See United States v. Seeger, 380 U.S. 163, 187, 85 S.Ct. 850, 864, 13 L.Ed.2d 733 (1965); Welsh v. United States, 398 U.S. 333, 340, 90 S.Ct. 1792, 1796, 26 L.Ed.2d 308 (1970) (plurality opin.) (both adopting functional definition, derived largely from Tillich, which treats as "religion" any set of beliefs addressing matters of "ultimate concern" occupying "a place parallel to that filled by ... God' in traditionally religious persons." 398 U.S. at 340, 90 S.Ct. at 1796)
 
 
 [11]
 But cf. Justice Rutledge dissenting in Everson v. Bd. of Educ., 330 U.S. 1, 32, 67 S.Ct. 504, 519, 91 L.Ed. 711 (1947): " 'Religion' appears only once in the [First] Amendment. But the word governs two prohibitions and governs them alike. It does not have two meanings, one narrow to forbid 'an establishment' and another, much broader, for securing 'the free exercise thereof.' 'Thereof' brings down 'religion' with its entire and exact content, no more and no less...." see also Malnak v. Yogi, 592 F.2d at 210-13 (Adams, J., concurring)
 
 
 [12]
 Plaintiffs' brief, however, leaves the distinct impression that their objection is less to Parks' novel per se, than to the public school curriculum itself--a curriculum which, as a result of Supreme Court rulings removing inculcation in religious doctrine and dogma from the classroom, they perceive as "establishing" secularism. See, e.g., Toscano, "A Dubious Neutrality: The Establishment of Secularism in the Public Schools," 1979 Brig.Young U.L.Rev. 177, 198
 Plaintiffs, however, fail to distinguish the process of secularization from the promotion of secularism. See H. Cox, The Secular City 18 (1966). While the promotion of secularism as a body of anti-religious doctrine is prohibited by the establishment clause, see Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952), the process of secularization has been the means of achieving compliance with the establishment clause: "It is generally said that the secularization of public education was brought about in order to prevent domination of the system by a prevailing religious sect." Comment, "Humanistic Values in the Public School Curriculum: Problems in Defining an Appropriate Wall of Separation," 61 Nw.U.L.Rev. 795, 803 (1966). See also Gianella, "Religious Liberty, Nonestablishment, & Doctrinal Development (Part I)," 80 Yale L.J. 1381, 1386 (1967) ("original constitutional consensus concerning religious liberty was an outgrowth of Protestant dissent and humanistic rationalism, the viewpoints that dominated the thinking of the authors of the Constitution.").
 
 
 [13]
 After Lynch, the opinion in Lemon is best understood as reflecting factors which may be central to any establishment clause analysis, rather than as articulating a single invariable test. "[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." Lynch, --- U.S. at ----, 104 S.Ct. at 1362
 
 
 [14]
 This is not to suggest that the formal imprimatur of a particular church or religious body is necessarily fatal under the establishment clause. Even the Bible, if appropriately presented, may be included within public school curricula. See Abington, 374 U.S. at 225, 83 S.Ct. at 1573. Similarly, the works of self-described humanists published in The Humanist, official organ of the American Humanist Association, and appended to appellants' brief may themselves be studied in the schools, subject to the same constraints
 
 
 [15]
 The district court found that "The Learning Tree is a novel with autobiographical overtones used in the English literature class of the school for the purposes of exposing students to expectations and orientations of Black Americans. It is also categorized as 'adolescent hero' literature. The book clearly serves a secular educational function."
 
 
 [16]
 Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (mandatory reading of state-composed prayer); Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (mandatory Bible reading at beginning of school day); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting of Ten Commandments in classroom); Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (prohibition against teaching principles of Darwinian evolution); McLean v. Arkansas Bd. of Educ., 529 F.Supp. 1255 (E.D.Ark.1982) (teaching of "creation-science")
 
 
 [17]
 "[T]he effect prong of the Lemon test is properly interpreted not to require invalidation of a government practice merely because it in fact causes, even as a primary effect, advancement or inhibition of religion. The laws upheld in [Walz, McGowan and Zorach ] had such effects, but they did not violate the Establishment Clause. What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." Lynch, 104 S.Ct. at 1368 (O'Connor, concurring)
 
 
 [18]
 Cf. West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (Jackson, J.): "If there is one fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."
 
 
 [19]
 Cf. Lynch, 104 S.Ct. at 1369 (O'Connor, J., concurring): "[T]he overall holiday setting changes what viewers may fairly understand to be the purpose of the display--as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content (emphasis added)."
 
 
 [20]
 The divine right of kings is "[t]he doctrine that a monarch in the hereditary line of succession has a divine and indefeasible right to his kingship and authority .... The origin of the doctrine is closely linked with the contest between the Holy Roman Emperor and the medieval papacy. In England ... [u]nder the Stuarts, ... the doctrine was professed by most leading Anglican divines." Oxford Dictionary of the Christian Church 412 (F.L. Cross ed. 1974); see also J. Locke, First Treatise of Civil Government (1689); A.P. d'Entrevas, Natural Law (2d ed. 1970)
 
 
 [21]
 See Lynch, 104 S.Ct. at 1379 (Brennan, J., dissenting) (referring to inclusion of the Bible or Milton's Paradise Lost in a course on English literature): "The purpose is plainly not to single out the particular religious beliefs that may have inspired the authors, but to see in these writings the outlines of a larger imaginative universe shared with other forms of literary expression (citing N. Frye, The Secular Scripture (1976) );" see also id., 104 S.Ct. at 1364 (no establishment despite "literally hundreds of religious paintings in governmentally supported museums")
 
 
 [22]
 The converse of the call to repentance and righteousness, the condemnation of oppression, injustice, and hypocrisy dominates the prophetic canon. See, e.g., Isaiah 1:10-23; 9:17, 29:13; Micah 3:1-12; Jeremiah 6:13-15, 9:8-9; see generally J. Bright, A History of Israel (2d ed. 1972); A. Heschel, The Prophets (1962). Squarely in this tradition are numerous remarks attributed to Jesus. See, e.g., Matthew 6:2-16; 7:1-5; 15:7; 22:18; 23:13-36; Mark 7-6, 12:15; Luke 6:42, 11:42-44, 12:1, 12:56, 13:15-17
 
 
 [23]
 See, e.g., G. Chaucer, The Canterbury Tales (A.C. Cawley ed. 1958); "Voltaire," Ency. of Philosophy, supra n. 5, at 1536; R. Pomeau, "Voltaire's Religion," in Voltaire: A Collection of Critical Essays 140 (Bottiglia ed. 1968); N. Torrey, "Voltaire and the English Deists," id. at 69; T. Paine, The Age of Reason: Part I (Castell ed. 1957); Mark Twain: Selected Writings of an American Skeptic (V. Doyno ed. 1983); M. Twain, Letters from the Earth (B. De Voto ed. 1962); S. Lewis, Elmer Gantry (1927); see also Classics in Free Thought (P. Blanshard ed. 1977) (excerpts from these and other authors)
 
 
 [24]
 See, e.g., Job 21:7-13, 24:1-25, 29-31:40
 
 
 [25]
 Honest, even agonizing doubt is not incompatible with Christian theism. See, e.g., P. Tillich, Dynamics of Faith 18 (1957) ("[D]oubt is a necessary element in [faith]. It is a consequence of the risk of faith."); S.H. Miller, The Great Realities (1955); S. Kierkegaard, Fear and Trembling (W. Lowrie trans. 1941); Concluding Unscientific Postscript (Swenson & Lowrie trans. 1941); G. MacGregor, Christian Doubt (1951)
 
 
 [26]
 The allegation was not contested by defendants, and must be accepted here as true. No opinion is expressed as to whether Cassie Grove could meet the requisite burdens, and survive the necessary balancing tests, to establish a free exercise right to be exempt from the state's neutral school assignment. See Wisconsin v. Yoder, 406 U.S. 205, 214-216, 92 S.Ct. 1526, 1532-1534, 32 L.Ed.2d 15 (1972); Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963); Callahan v. Woods, 736 F.2d 1269, 1273 (9th Cir.1984)
 
 
 [27]
 Cassie Grove was given a substitute assignment. She was also excused from class discussion of The Learning Tree, but chose to remain
 
 
 [28]
 "[T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, ... their claims would not ... rise to the demands of the Religion Clauses." Wisconsin v. Yoder, 406 U.S. at 215-16, 92 S.Ct. at 1533-34
 
 
 [29]
 See e.g., United States v. Albertini, 710 F.2d 1410 (9th Cir.1983), cert. granted, --- U.S. ----, 105 S.Ct. 562, 83 L.Ed.2d 504 (1984) (religiously motivated opposition to arms race); United States v. Lowe, 654 F.2d 562 (9th Cir.1981) (opposition to nuclear submarines)
 
 
 [30]
 While plaintiffs contend that Cassie Grove was subjected to some ridicule from her classmates and at least one arguably negative aside from her teacher because she objected to the book, there is no showing that this ridicule was sufficiently forseeable, orchestrated, or sustained for it to be attributable to defendants, or sufficiently coercive to violate plaintiffs' free exercise rights. Nor was such ridicule made a subject of the complaint